UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| ERICA LAYTON, SAMUEL LAYTON AND GERALD BUNTYN, JR. | : | CIVIL ACTION NO. _____ |
| VERSUS | : | JUDGE _____ |
| CHEVRON ENVIRONMENTAL MANAGEMENT COMPANY and CONESTOGA-ROVERS & ASSOCIATES, INC. | : | MAGISTRATE JUDGE _____ |

\*          \*          \*          \*          \*          \*          \*

## ORIGINAL COMPLAINT

COME NOW plaintiffs, ERICA LAYTON, SAMUEL EARL LAYTON and GERALD BUNTYN, JR., all persons of the full age of majority and residents of Shreveport, Caddo Parish, Louisiana, who file this original complaint against CHEVRON ENVIRONMENTAL MANAGEMENT COMPANY and CONESTOGA-ROVERS & ASSOCIATES, INC. (the "Defendants"), seeking damages arising out of personal injuries suffered by the plaintiffs.

## PARTIES

1.

CHEVRON ENVIRONMENTAL MANAGEMENT COMPANY, whose principal place of business is San Ramon, California, is authorized to do and doing business in the State of Louisiana, which may be served through its registered agent for service of process, Corporation Service Company, 320 Somerulos Street, Baton Rouge, LA 70820-6129; and

2.

CONESTOGA-ROVERS & ASSOCIATES, INC., whose principal place of business is Wilmington, Delaware, is authorized to do and doing business in the State of Louisiana, which may be served through its registered agent for service of process, Corporation Service Company, 320 Somerulos Street, Baton Rouge, LA 70820-6129.

## JURISDICTION

3.

The Court has jurisdiction over the lawsuit under 28 U.S.C. §1332(a)(1) because the plaintiffs and the defendants are citizens of different states and the amount in controversy exceeds $75,000, excluding interest and costs.

4.

Venue of this action is proper in this Court because the plaintiffs reside in Shreveport, Caddo Parish, Louisiana, which is in the Shreveport Division of the Western District of Louisiana.

## FACTS

5.

Beginning in 1929, in what is now Shreveport, Louisiana, Texaco operated a refinery and tank farm on approximately 200 acres known as Anderson Island. The refinery operation continued until 1940. Texaco sold the property in 1941 to Alexander Knight, a Louisiana resident. The act of conveyance required Texaco to dismantle the refinery and some of the tanks; pursuant to a lease with Knight, the remaining tanks were to be used by Texaco. By 1949,

Texaco no longer used the tanks; however, it never removed the attendant subsurface pipelines or certain other items from the property.

6.

Through ten separate sales, between 1950 and 1959, Knight conveyed his interest in the property. The purchasers and their grantees subdivided and developed the property. Plaintiff Erica Layton acquired the property in 1995 after an indeterminable number of intermediary transactions between the subdividers' sales and plaintiffs' purchase.

7.

Knight died in October 1981. One year later, the Environmental Protection Agency (EPA) conducted a "potential hazardous waste site inspection" on the property. It found, *inter alia,* arsenic, mercury, benzyne, chromium, and lead; it estimated that millions of gallons of sludge and oil remained under the property. Thereafter, the EPA listed it as a potential hazardous waste site; since 1992, it has listed it as a potential Superfund site. *See* 42 U.S.C. § 9601, *et seq*.

8.

A lawsuit was filed in 1997 against Texaco and others for land contamination and personal injury. The lawsuit was removed to the United States District Court for the Western District of Louisiana (97-CV-2019). It was ultimately dismissed and affirmed by U.S. Fifth Circuit Court of Appeal. *May v. Texaco*, No. 02-30123 , 73 Fed.Appx. 78 (2003) (not designated for publication).

9.

Erica Layton purchased the residence at 1106 E. Washington in Shreveport, Louisiana in 1995. At the time of purchase she did not know that the property was potentially contaminated

or any of the history concerning Anderson Island and Texaco's historical operations on or near their residence.

10.

On or about July 6, 2005, Chevron Environmental Management Company sent Erica Cook Buntyn (now Layton) a letter updating her on the ongoing environmental investigation in the Anderson Island area and requesting access to her property to conduct investigational activities including soil borings and the installation of soil vapor sampling points for the collection of soil vapor samples (Exhibit "A"). Nothing in this letter suggested that there were any health related concerns with her property.

11.

Soon thereafter, Erica Buntyn (now Layton) authorized Chevron Environmental Management Company to perform the work requested in its July 6, 2005 letter.

12.

On or about August 27, 2009, Chevron Environmental Management Company sent Erica Layton a letter stating that Chevron would compensate her $250 per year for each of the four existing vapor sample location on her property while they are in place (Exhibit "B"). These soil vapor sample locations were installed on her property on August 25, 2005. Chevron enclosed a check for $1,000 to cover the 1-year period August 2008 through August 2009. Chevron stated that Erica Layton would receive the next $1,000 payment in August 2010, and annually thereafter, as long as the four soil vapor sample locations remain in her yard. Nothing in this letter suggested that there were any health related concerns with her property.

13.

Beginning in August 2010, and each August thereafter, Raymond Trace Chadwick, in course in scope of his employment with Conestoga-Rovers & Associates, Inc., hand delivered checks to Erica Layton for her inconvenience due to the approximately eight monitoring wells located on her residential property.   At no time prior to August 13, 2012, during Raymond Trace Chadwick's visits with Erica Layton did he suggest that there were any health related concerns with her property.

14.

On August 13, 2012, Raymond Trace Chadwick, in course in scope of his employment with Conestoga-Rovers & Associates, Inc., personally met with Erica Layton at her residence and told her that they were going to have to drill under her foundation due to high levels of contamination. For the first time, Chadwick asked Erica Layton, "how is your health?".   In addition, for the first time, Chadwick advised Erica Layton that she could go to the library to view a website to review the health issues surrounding her property.   Chadwick spent approximately thirty minutes with Erica Layton walking around the outside of her property. Chadwick said that Conestoga and Chevron wanted to put an air monitoring ball in her house and drill down through the foundation in her garage.   Chadwick advised that Chevron was going to pay Erica Layton $2,000 to put the monitoring ball in her house and for the drilling through the foundation.

15.

On December 5, 2012, Chevron sent a certified letter to Erica Layton stating that Chevron working with the Louisiana Department of Environmental Quality has been

investigating conditions in her neighborhood and petroleum hydrocarbons have been detected in some of the samples collected (Exhibit "C"). Based on the investigation, LDEQ regulations required Chevron to conduct further testing on her property. The letter included details of the sub-slab vapor and indoor-outdoor air monitors required along with compensation at a rate of $250 for each location, or $500 in addition to the payments she currently received for the soil sample points currently in her yard. On or about December 10, 2012, Erica Layton signed the approval and provided it to Chadwick, Conestoga and Chevron.

16.

Despite Erica Layton's written approval described in the December 5, 2012 work, neither Chevron nor Conestoga has performed any work since the request and approval.

**MEDICAL**

17.

On or about January 2010, Erica Layton was diagnosed with rectal cancer. Erica was treated by Dr. Maxwell McDonald, an oncologist at Willis Knighton Cancer Center. In February 2001 doctors removed a cancerous mass in her rectum. Erica underwent another surgery for rectal cancer in March 2011.

18.

Also in 2010, Erica Layton was diagnosed with breast cancer. Erica underwent a double mastectomy in December 2010 at Wills Knighton Cancer Center.

19.

Erica Layton continues to receive medical treatment and monitoring for the colorectal and breast cancers. The cancers were caused by the concealment of the defendants of the cancer

causing constituents on the plaintiff's property and the delay in removing the cancer causing constituents from her property.

20.

As a result of the aforedescribed injuries, Erica Layton had to seek extensive medical attention and incurred medical expenses, such treatment to continue for an indefinite future period of time.

21.

In 1997, Gerald Buntyn, Jr., Erica Layton's son, began having headaches. It was discovered that Gerald has a chiari malformation on his brain. Gerald continues to see a neurologist regularly and requires medication.

22.

As a result of the aforedescribed injuries, Gerald Buntyn, Jr. had to seek extensive medical attention and incurred medical expenses, such treatment to continue for an indefinite future period of time.

## PROPERTY DAMAGES

23.

Due to the continuing discovery of health and environmental constituents of concerns at her residence, the property is devalued and requires remediation to regulatory standards.

## LOSS OF CONSORTIUM

24.

Samuel Earl Layton is the spouse of Erica Layton, and as such has sustained a loss of society and consortium due to the injuries sustained by Erica Layton.

**WHEREFORE, PREMISES CONSIDERED,** plaintiffs pray that defendants be cited to appear and answer herein, and upon trial hereof, plaintiffs recover judgment of the Court against defendants in a total amount of money within the jurisdictional limits of this Court, together with pre-judgment and post-judgment interest, as provided by applicable law; for all costs of court; and for all such other and further relief, both general and special, legal and equitable, to which they are shown or may show themselves justly entitled.

                Respectfully submitted,

                /s/ J. Rock Palermo III
                J. Rock Palermo III (#21793)
                Turner D. Brumby (#33519) (trial attorney)
                Veron, Bice, Palermo & Wilson, L.L.C.
                721 Kirby Street, 70601
                P.O. Box 2125
                Lake Charles, LA 70602-2125
                337-310-1600
                Fax: 337-310-1601
                **rock@veronbice.com**
                **turner@veronbice.com**

                *Counsel for Plaintiff Erica Layton, Samuel Layton and Gerald Buntyn, Jr.*